Rafael FERNANDEZ–ROQUE, et
al., Petitioners,

v.

William French SMITH, et al.,
Respondents.

Moises GARCIA–MIR, et al., Plaintiffs,

v.

William French SMITH, et al.,
Defendants.

Orlando CHAO–ESTRADA, Petitioner,

v.

William French SMITH, et al.,
Respondents.

Civ. A. Nos. C81–1084A, C81–938A
and C81–1350A.

United States District Court,
N.D. Georgia,
Atlanta Division.

July 7, 1983.

Dale M. Schwartz, Myron N. Kramer, Deborah S. Ebel, Kenneth Hindman, and David A. Webster, Atlanta, Ga., American Civil Liberties Union and Lawyers Committee for International Human Rights, New York, N.Y., amici curiae.

Douglas P. Roberto, Asst. U.S. Atty., Atlanta, Ga., Lauri Steven Filppu, William C. Brown, Stephen M. Weglian, Dept. of Justice, Washington, D.C., for respondents.

## ORDER

SHOOB, District Judge.

This litigation brought on behalf of Cuban detainees at the Atlanta Federal Penitentiary has reached a critical juncture. Presently before the Court for decision is a petition for writ of habeas corpus challenging the legality of the continued incarceration of Cubans who have been determined not to be releasable under the Attorney General's Status Review Plan. Petitioners also include a significant number of Cubans who were previously paroled into the United States by the Attorney General pursuant to his authority under 8 U.S.C. § 1182(d)(5), but who are now incarcerated in Atlanta following revocation of their parole.[1] Before addressing petitioners' legal claims, the Court will briefly review the history of these consolidated cases to set the background for the legal discussion that follows.

## BACKGROUND

On January 8, 1981, Moises Garcia-Mir, a Cuban national who arrived on these shores

---

**1.** The government's latest status report, filed June 16, 1983, lists 255 detainees incarcerated as a result of parole revocations. This number comprises slightly less than 25% of the total of 1059 Cubans being detained at the penitentiary as of June 13, 1983. Of this total number, 150 detainees had already been determined releasable under the Attorney General's Status Review Plan but remained incarcerated awaiting sponsors.

as a member of the 1980 "Freedom Flotilla" from Mariel, Cuba, and who was then incarcerated at the federal penitentiary in Leavenworth, Kansas, filed a class action complaint for declaratory and injunctive relief in the United States District Court for the District of Kansas, seeking a declaration that his continued incarceration was arbitrary, an abuse of the Attorney General's discretion, and a violation of his constitutional rights and fundamental human rights under international law. The complaint, brought on behalf of approximately 1,800 incarcerated Cubans, alleged that the continuing detention was illegal in the absence of a determination that, if released, an alien was likely to abscond, to pose a national security risk, or to pose an actual and serious threat to persons or property within the United States. Based on this alleged illegality, plaintiffs sought either immediate release or a procedurally adequate hearing to determine whether continued detention was warranted.

Shortly after the filing of Garcia-Mir's complaint, all Cubans incarcerated in various federal facilities were transferred to the United States Penitentiary in Atlanta, Georgia. Accordingly, on May 12, 1981, the United States District Court for the District of Kansas transferred the *Garcia-Mir* case to this Court.

On June 5, 1981, Rafael Fernandez-Roque, another member of the "Freedom Flotilla" who was incarcerated at the U.S. Penitentiary in Atlanta, filed a class action petition for habeas corpus relief challenging the refusal of the Attorney General to release on parole those Cubans who continued to be incarcerated solely on the ground that they were excludable for lack of proper entry documents pursuant to 8 U.S.C. § 1182(a)(20). Fernandez-Roque contended that such continued incarceration constituted an abuse of discretion, a violation of constitutional rights and a violation of fundamental human rights under international law. Because the class that Fernandez-Roque sought to represent would have been a subclass of the class that Garcia-Mir sought to represent, the Court consolidated the two actions by its order of July 14, 1981. The individual habeas petition filed by Orlando Chao-Estrada was consolidated with the two class actions on July 24, 1981.

On August 7, 1981, the Court entered an order granting, *inter alia,* plaintiffs' renewed motion for class certification and conditionally certified a class of all Cuban nationals incarcerated at the Atlanta Federal Penitentiary who had arrived in this country as part of the "Freedom Flotilla" of 1980. *Fernandez-Roque v. Smith,* 91 F.R.D. 117, 123, *as modified,* 91 F.R.D. 239, 240 n. 1 (1981). The Court also certified twelve subclasses and issued a series of show cause orders to the government. *Id.* at 124–26.

The twelve subclasses were defined in terms of the government's excludability determinations and were designed to separate detainees into categories according to release priorities. Subclasses one through four were comprised of Cubans who were charged or found excludable solely on the basis of lack of proper entry documents. This Court had already determined in an earlier case that incarceration for this reason alone was an abuse of the Attorney General's discretion. *Soroa-Gonzales v. Civiletti,* 515 F.Supp. 1049 (N.D.Ga.1981). The higher-numbered subclasses consisted of Cubans who had been found excludable for increasingly serious crimes in Cuba, or those who had been accused or convicted of criminal activity in the United States. The subclasses were thus intended to facilitate the earliest release of those Cubans as to whom the government was the least likely to object.

Shortly after the August 7, 1981, order was entered the government filed a motion for relief from the order, asking that the Court defer its show cause hearings until class members had exhausted their administrative remedies under a new, accelerated status review plan. Attached to the government's motion was a copy of the Status Review Plan and Procedures ap-

proved by the Attorney General on July 24, 1981, under which the government proposed to review each detainee to determine whether continued detention was necessary.

The Court proceeded on August 17 and 19, 1981, to conduct the show cause hearings ordered with respect to subclasses one through four. Because the government failed to show cause why members of these subclasses should not be released, the Court ordered that they be released as soon as sponsors could be located, and in no case later than September 15, 1981. *Fernandez-Roque, supra,* 91 F.R.D. 239, 243, (Order of Aug. 20, 1981). The Court also ordered the release of 155 detainees as to whom the government announced in open court on August 17, 1981, that it had no further objections to release. *Id.* at 241.

The government then moved to stay the August 20 order, and on August 21, 1981, the Court modified its order to permit the government to perform its own review under the Attorney General's Status Review Plan of those ordered released. Since that time, releases have proceeded pursuant to the Attorney General's plan, and this Court has entered no further orders of release.

On October 20, 1981, plaintiffs moved for entry of writs of habeas corpus as to those class members who had been approved for release under the Attorney General's review plan since August 20, 1981, but who remained incarcerated. On November 12, 1981, at plaintiffs' request, the Court deferred ruling on this motion. Subsequently, on January 21, 1982, plaintiffs filed suggestions for further releasability proceedings, proposing that they be allowed to inspect Bureau of Prison ("BOP") and Immigration and Naturalization Service ("INS") files for each class member held under a final administrative order of detention. Plaintiffs stated that once the inspection was completed, class-wide and subclass-wide challenges would be made to the Cubans' continued detention. Following the Court's granting of plaintiffs' motion to compel production of BOP and INS files on the detainees, plaintiffs commenced the necessary file review.

Thereafter, on July 27, 1982, plaintiffs renewed their motion for habeas corpus relief for those detainees determined releasable but still incarcerated awaiting sponsors. The Court ordered that a show cause hearing be held on September 3, 1982, and at that hearing plaintiffs presented evidence of the especially deleterious psychological impact upon potential releasees of continued detention following approval for release. Plaintiffs also presented evidence of available sponsorship alternatives that could significantly reduce the release waiting time. Subsequently, in its order of November 23, 1982, the Court found that the Attorney General had abused his discretion by placing unreasonable restrictions on sponsorship placements and ordered that certain measures be taken to correct the abuses. *Fernandez-Roque v. Smith,* 557 F.Supp. 690 (N.D.Ga.1982). That order is presently on appeal by the government to the Court of Appeals for the Eleventh Circuit (Docket No. 83–8065).

Meanwhile, having completed their file review, plaintiffs on November 15, 1982, filed their brief in support of their habeas corpus petition on behalf of all class members determined nonreleasable. The government was granted an extension of time to respond and filed its memorandum in opposition to the petition on January 26, 1983. Plaintiffs filed a supplemental brief in support of their petition on March 1, 1983, and on March 22, 1983, two *amici curiae,* the American Civil Liberties Union and the Lawyers Committee for International Human Rights, were permitted to file a brief in support of plaintiffs' international law claims. The government filed a final reply memorandum on April 25, 1983. Because of the complexity and importance of the issues involved, the Court also heard oral arguments by both parties on May 2, 1983. The parties have now filed post-oral argument memoranda, and the habeas corpus petition is ripe for decision.

## DISCUSSION

### I. *Jurisdiction*

In *Soroa-Gonzales v. Civiletti,* 515 F.Supp. 1049, 1054–56 (N.D.Ga.1981), this Court held that it had jurisdiction to review the legality of Soroa-Gonzales' continued confinement under the provisions of 8 U.S.C. § 1329, 28 U.S.C. § 1331, and 28 U.S.C. § 2241. For the same reasons as were stated there, the Court concludes that it has jurisdiction over the instant petition.

■ In *Soroa-Gonzales, supra,* 515 F.Supp. at 1057–61, the Court reviewed the Attorney General's decisions to revoke, and not to reinstate, petitioner's parole under an abuse of discretion standard. In addition to reviewability for abuse of discretion, the scope of this Court's review also extends to a determination of whether petitioners' continued detention exceeds respondents' statutory authority, or is contrary to constitutional right. 5 U.S.C. § 706; 28 U.S.C. § 2241(c)(3). Petitioners challenge their continued incarceration as being both beyond the Attorney General's statutory authority and in violation of their constitutionally protected rights.[2] They also challenge the Attorney General's refusal to release various subclasses as an abuse of discretion. Each of these challenges is addressed in turn below.

### II. *Statutory Authority*

Petitioners contend that there is no statutory authority for the continued indefinite administrative detention of any class member, regardless of the characteristics of the class member. The government, on the other hand, argues that it has the power to detain and incarcerate forever, if necessary, any class member who, in the discretionary opinion of the Attorney General, is not suitable for release on parole.

Both parties agree that there is no *express* statutory authority for the indefinite detention of excludable aliens such as petitioners. Congress, evidently not foreseeing a situation where large numbers of excludable aliens arrive on our shores and then are denied reentry by their native country, enacted an exclusion procedure that envisions a swift decision regarding admission, rapid administrative and judicial review, and prompt execution of any final order of exclusion. Thus, upon the arrival of aliens at a United States port, "immigration officers may order a temporary removal of such aliens for examination and inspection. . . ." 8 U.S.C. § 1223(a). If, after such inspection, an alien does not appear to the examining immigration officer "to be clearly and beyond a doubt entitled to land [the alien] shall be detained for further inquiry. . . ." 8 U.S.C. § 1225(b). The aliens in the instant case were initially detained under the authority of this subsection.

Following an alien's initial detention under § 1225(b), "a special inquiry officer shall conduct proceedings . . . to determine whether an arriving alien . . . shall be allowed to enter or shall be excluded and deported." 8 U.S.C. § 1226(a). Any alien who is excluded as a result of such proceedings "shall be immediately deported to the country whence he came, in accommodations of the same class in which he arrived,

---

2. Petitioners also argue that their continued detention violates principles of international law, as derived from the practices of nations and various international instruments. The Court has determined, however, that the rights accorded petitioners under international law are no greater than those provided under our own Constitution. If, on the contrary, the domestic law of the United States did not extend such protection to petitioners here, then the Court would agree that the various international law principles proscribing prolonged, arbitrary detention of persons are binding on this country and require the same sort of procedural safeguards as the Court has determined below are mandated by the Constitution of the United States. *See* Universal Declaration of Human Rights, Arts. 3 and 9, U.N.Doc. A/801 (1948); The American Convention on Human Rights, Part I, ch. II, Art. 7, 77 Dept. of State Bull. 28 (July 4, 1977); International Covenant on Civil and Political Rights, Art. 9, G.A.Res. 2200A (XXI) (Dec. 16, 1966); United Nations Protocol Relating to the Status of Refugees, Art. 31, 19 U.S.T. 6223, T.I.A.S. No. 6577 (1967).

on the vessel or aircraft bringing him, unless the Attorney General, in an individual case, in his discretion, concludes that immediate deportation is not practicable or proper." 8 U.S.C. § 1227(a).

Petitioners argue that this statutory scheme contemplates only a temporary detention incident to and for purposes of accomplishing immediate deportation. To continue to incarcerate excludable aliens more than three years after their arrival in this country, and while there continues to be no realistic prospect of return to Cuba, is simply without statutory authority, petitioners contend.

Petitioners rely primarily on the Supreme Court's decision in *Wong Wing v. United States,* 163 U.S. 228, 16 S.Ct. 977, 41 L.Ed. 140 (1896), and the Tenth Circuit's recent decision in *Rodriguez-Fernandez v. Wilkinson,* 654 F.2d 1382 (10th Cir.1981). In *Wong Wing* the Supreme Court held that although the government could detain an alien pending exclusion, it could not supplement the order of exclusion by inflicting summary punishment at hard labor:

> We think it clear that detention or temporary confinement, as part of the means necessary to give effect to the provisions for the exclusion or expulsion of aliens, would be valid. Proceedings to exclude or expel would be vain if those accused could not be held in custody pending the inquiry into their true character, and while arrangements were being made for their deportation. Detention is a usual feature in every case of arrest on a criminal charge, even when an innocent person is wrongfully accused; but it is not imprisonment in a legal sense.
>
> . . . .
>
> But when congress sees fit to further promote such a policy [of exclusion of certain classes of aliens] by subjecting the persons of such aliens to infamous punishment at hard labor, or by confiscating their property, we think such legislation, to be valid, must provide for a judicial trial to establish the guilt of the accused.

*Wong Wing, supra,* 163 U.S. at 235, 237, 16 S.Ct. at 980, 981.

In *Rodriguez-Fernandez, supra,* 654 F.2d at 1387, the Tenth Circuit held that the logic of *Wong Wing* also applied when an excludable Cuban alien who was being detained in a federal prison sought habeas corpus relief:

> Detention pending deportation seems properly analogized to incarceration pending trial or other disposition of a criminal charge, and is, thus, justifiable only as a necessary, temporary measure. Obviously detention pending trial assumes a different status if there is to be no trial. If, in this case, administrative officials ordered penitentiary confinement for life or a definite term because Cuba would not accept petitioner, it seems certain the Courts would apply *Wong Wing* and hold that such imprisonment is impermissible punishment rather than detention pending deportation. Logic compels the same result when imprisonment is for an indefinite period, continued beyond reasonable efforts to expel the alien.

Thus, the court held that the statutory scheme did not authorize indefinite detention as an alternative to exclusion, but at the same time the court declined to read into the statute a specific time limit for detention.

> Rather, since the statute contemplates temporary detention, we hold that detention is permissible during proceedings to determine eligibility to enter, and, thereafter, during a reasonable period of negotiations for their return to the country of origin or to the transporter that brought them here. After such a time, upon application of the incarcerated alien willing to risk the possible alternatives to continued detention, the alien would be entitled to release.

*Id.* at 1389–90.

The government, in opposition to petitioners' contentions, relies on the Fourth Circuit's recent decision in *Palma v. Ver-*

*deyen,* 676 F.2d 100 (4th Cir.1982). In that case the Fourth Circuit reversed a district court's grant of habeas relief to an incarcerated, excludable Cuban alien, holding that "the Attorney General has implicit authority to detain rather than parole an excluded alien who cannot be returned to his own country." 676 F.2d at 104. The court found it significant that Congress had not expressly denied such authority with respect to excludable aliens, while, if an alien is subject to deportation as distinguished from exclusion, the Attorney General is required to deport him within six months or else release him. 8 U.S.C. § 1252(c). "The absence of a six month restriction on detention ... in the exclusion provision of § 1227(a) is indicative of congressional intent to authorize restrictions on the freedom of excluded aliens greater than those imposed on resident aliens." 676 F.2d at 104. The court distinguished *Rodriguez-Fernandez, supra,* by the fact that that case had been decided before the Attorney General's institution of the Status Review Plan. 676 F.2d at 105.

■ From its own analysis of the statutory language and review of the cases relied on by both parties, this Court concludes that the government does possess an implied statutory authority to detain for an indefinite period excludable aliens who cannot be returned to their country of origin.

■ First, the statutory scheme clearly contemplates, at the very least, the temporary detention of aliens in conjunction with the prompt determination of excludability and the expeditious removal of an inadmissible alien. The statute, however, also recognizes that expeditious removal may not always be possible. The Attorney General

may conclude that "immediate deportation is not practicable or proper." 8 U.S.C. § 1227(a).

Second, the Court agrees with the Fourth Circuit that the failure of Congress to place any express limit on the detention of excludable aliens, while imposing a specific six month limitation on detention of aliens apprehended in the United States and subject to expulsion proceedings, was not a mere oversight but reflects an intent to permit greater restrictions on excluded aliens than on resident aliens. The distinction between excludable and deportable aliens is not without some rational basis. A deportable alien, *i.e.,* an alien who has already gained entry into this country either legally or illegally, will often have ties to the community in which he resides, in the form of family and/or property, that militate against the need for long term detention if immediate deportation is not possible. Aliens apprehended at the border, however, will perforce have no such ties. Congress could reasonably have concluded, therefore, that an absolute time limit on the detention of excludable aliens would be unwise.[3]

■ Finally, because the authority of Congress and the executive over immigration matters "is plenary and knows few bounds," *Jean v. Nelson,* 711 F.2d 1455, 1465 (11th Cir.1983), this Court is extremely reluctant to imply a statutory limitation on the Attorney General's detention authority where none is expressly provided. This reluctance is even more pronounced in light of the fact that imposition of such a limitation would require the government to release detainees without regard to their potential threat to public safety or their own ability to care for themselves. Petitioners point out that the release of the detainees would

**3.** Admittedly, the distinction between excludable and deportable aliens does sometimes have the anomalous result that an alien who deceitfully obtains entry into the United States is accorded more legal protections than an alien who, upon arrival at the border, honestly admits to circumstances that may render him excludable. This, however, does not complete-

ly undermine the rationale of the distinction. In any case, the Court is concerned at this stage of its analysis only with discerning Congress's intent from the statutory language employed, and not with whether it would, if given the opportunity, adopt the same distinction as a matter of immigration policy.

not in any way abridge the congressionally delegated power of the executive to deny admission to aliens, because release on parole would not amount to a formal "admission" of the alien under the immigration laws. This technical distinction, however, would provide scant comfort to citizens who have legitimate fears of being victimized by the criminal acts of paroled aliens with prior records of serious criminal behavior.

This Court is convinced, therefore, that the Attorney General possesses *statutory* authority to detain excludable aliens for an indefinite period if immediate exclusion is impracticable. It remains to be considered, however, whether there exist any *constitutional* limits on the Attorney General's detention power.

### III. *Constitutional Restrictions*

The fifth amendment to the United States Constitution provides in part: "No person shall be ... deprived of life, liberty, or property, without due process of law...." It is well settled, however, that this provision affords no procedural guarantees to aliens seeking initial admission to the United States. Congress, exercising this nation's inherent rights of sovereignty, has plenary authority over the admission of aliens to this country: "Whatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned." *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212, 73 S.Ct. 625, 629, 97 L.Ed. 956 (1953) (*quoting United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 544, 70 S.Ct. 309, 313, 94 L.Ed. 317 (1950)). Only this term the Supreme Court reaffirmed this view in *Landon v. Plasencia,* —— U.S. ——, 103 S.Ct. 321, 329, 74 L.Ed.2d 21 (1982): "This Court has long held that an alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application, for the power to admit or exclude aliens is a sovereign prerogative."

Petitioners in the instant case, however, do not seek formal admission to this country. They simply assert a right to be free from arbitrary detention despite the government's determination that they are excludable. In this regard the relevant principle to be recognized is that the protections afforded by the fifth amendment, as the plain words of the amendment indicate, extend to "persons" and are not restricted merely to citizens or to admissible aliens. The words of the Supreme Court nearly a century ago, discussing the parallel provision of the fourteenth amendment, are equally applicable here:

> The Fourteenth Amendment to the Constitution is not confined to the protection of citizens. It says: 'Nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.' These provisions are universal in their application, to all persons within the territorial jurisdiction, without regard to any differences of race, of color, or of nationality; and the equal protection of the laws is a pledge of the protection of equal laws.

*Yick Wo v. Hopkins,* 118 U.S. 356, 369, 6 S.Ct. 1064, 1070, 30 L.Ed. 220 (1886).

The only challenge that might be made to the applicability of the fifth amendment to petitioners in the instant case would be based on the legal fiction that excludable aliens are not within the "territorial jurisdiction" of the United States but remain "stopped at the border." The Eleventh Circuit, however, has recently rejected the notion that a person's status as an excludable alien places him beyond the ambit of the fifth amendment. "Though that fiction serves its purpose to limit the procedural rights of an excludable alien 'regarding his application' for admission, *Landon v. Plasencia, supra,* [103 S.Ct. at 329], it strains credulity to maintain that an alien within our territorial limits may claim none of the rights accorded our citizens." *Jean v. Nelson, supra,* 711 F.2d at 1484. *See also Plyler v. Doe,* 457 U.S. 202, 102 S.Ct. 2382, 2391,

72 L.Ed.2d 786 (1982) (whatever his status under the immigration laws, an alien is surely a "person" in any ordinary sense of that term under fifth and fourteenth amendments); *United States v. Henry,* 604 F.2d 908 (5th Cir.1979) (excludable alien entitled to fifth amendment rights once criminal proceedings against him have commenced); *Rodriguez-Fernandez, supra,* 654 F.2d at 1387 (excludable alien in physical custody within the United States may not be "punished" without being accorded the substantive and procedural due process guarantees of the fifth amendment).

The government does not dispute the applicability of fifth amendment protections to excludable aliens under the circumstances found in the cases noted above. However, the government contends that in the instant case the fifth amendment due process clause is not implicated, because petitioners are not suffering an infringement of any interest protected under that clause:

> The Government is not endeavoring to deprive these aliens of life or property, nor is it seeking to deprive them of liberty except in aid of its exclusion of them from the midst of our society. It is in this context that these excludable aliens have no liberty interest protected by the constitution, and it is only this context that has any relevance to this case.

Defendants' Memorandum in Opposition to Habeas Corpus Petition at 52. And again:

> The power to detain arises from the facts that the plaintiffs are aliens and that they are excludable. These questions are resolved in exclusion proceedings before immigration judges. The aliens are given all the procedural protections authorized by Congress in those proceedings. Af-

ter it is determined that they are excludable, they have no constitutionally protected liberty interest to assert.

Defendants' Reply Memorandum in Opposition to Habeas Corpus Petition at 8. Simply put, the government contends that excludability *alone* is a sufficient predicate for indefinite detention,[4] and that the decision to release an excludable alien on parole is purely a matter of executive "grace" to which no procedural requirements attach.

The government analogizes petitioners' situation to that of the plaintiff inmates in *Greenholtz v. Inmates of the Nebraska Penal and Correctional Complex,* 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979), who claimed that they were denied procedural due process by the Nebraska Board of Parole in its parole release determinations. In *Greenholtz* the Supreme Court reiterated "that to obtain a protectible right ... [a person] must ... 'have a legitimate claim of entitlement to it,'" (quoting *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972)), and concluded that no entitlement to due process was created merely because a state provides for the *possibility* of release on parole:

> There is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence. The natural desire of an individual to be released is indistinguishable from the initial resistance to being confined. But the conviction, with all its procedural safeguards, has extinguished that liberty right....
>
> Decisions of the Executive Branch, however serious their impact, do not automatically invoke due process protection; there simply is no constitutional guarantee that all executive decisionmaking

---

**4.** Thus the government would appear, at least, to agree that a final order of exclusion is necessary to justify prolonged detention. Accordingly, the continued detention of any class member who either has not been afforded an exclusion hearing or has not yet received a final order of exclusion is unlawful. Any detainee in these categories must be provided an exclusion hearing, or a final determination of his excludability made, within 60 days of the date of this order. Otherwise, continued detention cannot be justified even on the government's own theory, and the detainee must be released. *See Garcia-Mir v. Wilkinson,* Civil Action No. 80–3139 (D.Kan. Sept. 2, 1980) (INS ordered to provide exclusion hearings for Cuban detainees at Fort Leavenworth Penitentiary).

must comply with standards that assure error free determinations. [Citations omitted.] This is especially true with respect to the sensitive choices presented by the administrative decision to grant parole release.

442 U.S. at 7, 99 S.Ct. at 2104. The Court went on to hold, however, that the Nebraska statutory language itself created a protectible expectation of parole, because it provided that the Board of Parole "shall order" a prisoner's release "unless" at least one of four designated reasons is found. *Id.* at 12, 99 S.Ct. at 2106.

The government argues that the determination of excludability, like the conviction in *Greenholtz*, extinguishes any liberty right petitioners may have and forms the basis for their lawful confinement. Moreover, unlike the Nebraska statute, 8 U.S.C. § 1182(d)(5) provides that "[t]he Attorney General *may in his discretion* parole" aliens into the United States. (Emphasis added.) Hence, the government argues, the statutory language creates no legitimate expectation of parole and thus no protectible liberty interest.

There is, however, a flaw in the government's attempted analogy with the *Greenholtz* case. The inmates in that case were all incarcerated pursuant to valid convictions for criminal offenses. Petitioners in the instant case, on the other hand, have simply been found to be excludable aliens under the immigration laws, a determination that may be premised on any one of the thirty-two categories listed in 8 U.S.C. § 1182(a), including such conditions as mental retardation and chronic alcoholism. The government contends that this factual distinction does not affect the sufficiency of the exclusion decision as a predicate for indefinite detention. In this Court's view, however, the essentially different nature of a criminal conviction, as compared to an administrative determination of excludability, is what lies at the very heart of this case.

A criminal conviction is the result of a factual determination, reached by means of an adversary proceeding incorporating the full panoply of due process protections, that an accused has committed all the elements of a recognized crime, for which society has determined some fixed period of incarceration (or perhaps some lesser punishment) to be the maximum just desert. A determination of excludability, on the other hand, is based on an administrative decision that an alien is not admissible to this country for any of a variety of reasons, *see* 8 U.S.C. § 1182(a), none of which has been legislatively made the basis of incarceration or other punishment, and many of which could not constitutionally be made the basis for such criminal sanctions. *See, e.g., Robinson v. California,* 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962) ("status" of narcotic addiction may not constitutionally be made a criminal offense).

Looking first at the procedural aspects of the exclusion hearing, the Court notes that the proceeding provided by statute, *see* 8 U.S.C. §§ 1221–1230, and regulation, *see* 8 C.F.R. § 236 (1982), is inquisitorial rather than adversarial. A special inquiry officer (also known as an immigration judge) conducts the proceedings and interrogates the alien and other witnesses. 8 U.S.C. § 1226(a). The regulations, however, do provide the alien certain procedural rights. The immigration judge is required to

> inform the applicant [for admission] of the nature and purpose of the hearing; advise him of the privilege of being represented by an attorney of his own choice at no expense to the Government, and of the availability of free legal services programs . . .; advise him that he will have a reasonable opportunity to present evidence in his own behalf, to examine and object to evidence against him, and to cross-examine witnesses presented by the Government. . . .

8 C.F.R. § 236.2(a) (1982). Moreover, the statute provides that the special inquiry officer's determination shall be based only on the evidence produced at the exclusion hearing. 8 U.S.C. § 1226(a). A decision

may then be appealed, by either the alien or the district director, to the Board of Immigration Appeals. 8 U.S.C. § 1226(b); 8 C.F.R. § 236.7 (1982). Absent an appeal, the special inquiry officer's determination is final. 8 U.S.C. § 1226(c); 8 C.F.R. § 236.6 (1982).

Despite the superficial adequacy of such exclusion hearings, one recent commentary has argued that the "procedural safeguards [are] largely illusory." *Developments in the Law—Immigration Policy and the Rights of Aliens,* 96 Harv.L.Rev. 1286, 1364 (1983). That study contends that the "[e]nforcement mentality and administrative supervision of judges [that] are inherent in the current system" result in "immigration judges [who] are frequently predisposed to discount aliens' claims" and INS officials who "seek to influence the outcome of particular cases." *Id.* at 1364–65 (footnotes omitted). The appeals process, according to this commentary, is equally ineffective because, even in the few cases where aliens can obtain attorneys to take appeals, "they are heard before enforcement officials or judges controlled by such officials. Thus, [because] the Board of Immigration Appeals is a creature of regulation and could be abolished by the Attorney General [*see* 8 C.F.R. § 3.1(a)(1) (1982)] ..., the implicit threat of abolition undermines the independence of the Board's judgment." 96 Harv.L.Rev. at 1365 (footnote omitted).

Apart from the question of an exclusion hearing's *procedural* adequacy for establishing a sufficiently reliable predicate for long-term detention, there is the question of whether the *substantive* nature of the hearing is such as to allow its outcome to justify an indefinite period of incarceration. It is true that detention is authorized pending the immediate exclusion of an excludable alien, and, as this Court has concluded above, that even *indefinite* detention is permitted where immediate exclusion is impracticable. This, however, does not alter the fact that, unlike an accused's conviction for a criminal offense and his subsequent imprisonment, there is no essential connection between an alien's being determined excludable and the need or propriety of subsequent imprisonment, at least not after an initial period during which detention may reasonably be imposed as an aid to effecting exclusion. This initial period has long since passed in the instant case, and further detention must therefore be premised on something other than a prior excludability determination.

■ Once an excludable alien's detention can no longer be justified merely as a means to his exclusion, *i.e.,* once detention is no longer justifiable simply on the basis of excludability, then a legitimate expectation arises that the detention will end unless some new justification for continuing the detention is established. The basis for this expectation is simply the fundamental principle inherent in our constitutional system that all persons are entitled to their liberty absent some legally sufficient reason for detaining them. An alien's excludability provides such a reason so long as the detention reasonably serves as an aid to the alien's exclusion. After this initial period of time, however, the individual's basic entitlement to liberty once again comes to the fore. Thus, even though the government is authorized to detain excludable aliens indefinitely where immediate exclusion is impracticable, the excludability determination itself provides the essential predicate for the exercise of this authority only for an initial, temporary period of time. Thereafter, a liberty interest arises on behalf of the alien detainee requiring that the continued exercise of the detention power be justified on the basis of a procedurally adequate finding that the detainee, if released, is likely to abscond, to pose a risk to the national security, or to pose a serious and significant threat to persons or property within the United States.[5]

The *Mezei* case, *supra,* on which the government relies, does not require a con-

---

5. Accordingly, the Court does not reach the question whether, as petitioners argue, a pro-

trary holding. In that case the Supreme Court held that the continued exclusion of an alien as a bad security risk, even without a hearing, did not deprive him of any statutory or constitutional right, despite the fact that exclusion resulted in the alien's indefinite detention on Ellis Island because other countries refused to admit him. *Id.,* 345 U.S. at 213–16, 73 S.Ct. at 629–31. In *Mezei,* however, the alien was obliged to seek formal admission to the United States, since at that time there was no provision for the parole of excludable aliens. Hence, "the primary focus of *Mezei* was upon the excluded alien's right to a due process hearing concerning his right of reentry into this country." *Rodriguez-Fernandez, supra,* 654 F.2d at 1388. Here, however, petitioners seek only temporary release on parole and not admission to the United States. This alone, in this Court's view, is sufficient to distinguish *Mezei* from the instant case and to justify rejection of the government's contention that no constitutional infirmities inhere in petitioners' continued indefinite detention. Nevertheless, *Mezei* is also distinguishable on other grounds.

Mezei was excluded pursuant to the Attorney General's authority under the Passport Act, ch. 81, § 1, 40 Stat. 559 (1918), *as amended by* ch. 210, § 1, 55 Stat. 252, 22 U.S.C. § 223 (1941), *repealed by* ch. 477, Title IV, § 403(a)(15), (20), (43), 66 Stat. 279, 280 (1952). The original Act passed on May 22, 1918, granted the President power to impose restrictions on the entry and departure of individuals to and from the United States during wartime. The Act was amended on June 22, 1941, to allow the President to impose such restrictions not only when the United States was at war but also when a state of war existed among two or more other nations, or pursuant to the national emergency proclaimed by the President on May 27, 1941. The Act was repealed on June 27, 1952, and similar restrictions were adopted that are now found at 8 U.S.C. § 1185. These restrictions may be imposed when the United States is at war, during the existence of any national emergency proclaimed by the President, or, in the case of aliens, whenever a state of war exists between two or more nations. 8 U.S.C. § 1185(a).

With respect to petitioners in the instant case, no national emergency has been declared by the President, nor has the President sought to impose the restrictions contained in 8 U.S.C. § 1185 on members of the "Freedom Flotilla." Rather than turning to the powers conferred pursuant to 8 U.S.C. § 1185, the government has relied on normal immigration statutes to support petitioners' continued detention. The *Mezei* decision, which upheld the alien's permanent exclusion, was clearly predicated on the existence of a national emergency, *see Mezei, supra,* 345 U.S. at 210, 73 S.Ct. at 628. During such a time, the powers of the President are at their zenith and constitutional rights may be curtailed. *See Dames & Moore v. Regan,* 453 U.S. 654, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981). *Mezei* is therefore distinguishable from the instant case insofar as its decision allowing detention was premised upon a statute conferring wartime or national emergency powers.

Accordingly, the Court concludes that petitioners have an interest in their freedom from administrative detention that is protected by the due process clause of the fifth amendment. The Court must next determine just what process is due under the unusual circumstances of this case, and whether the review procedures already instituted by the government are adequate to meet constitutional requirements.

## IV. *What Process is Due*

The government contends that even assuming that the due process clause imposes procedural constraints on parole determinations, the Attorney General's Status Review

---

tected liberty interest also arises as a result of (1) the government's alleged "invitation" to petitioners to come to this country; (2) petitioners' asylum claims; (3) the government's own parole regulations; or (4) the Attorney General's Status Review Plan itself.

Plan fully meets any such constitutional requirements. A brief description of the Status Review Plan and Procedures, as modified and approved by the Attorney General for a two year extension on April 28, 1983, see Attachment to Status Report for May 1983, is set out below.

### A. *The Status Review Plan*

The Attorney General's Plan is designed to facilitate parole determinations made pursuant to 8 U.S.C. § 1182(d)(5) and applies to any Mariel Cuban detained by the INS in any BOP facility pending his exclusion hearing and/or his deportation to Cuba or to another country. Initial recommendations for or against release on parole are made by Review Panels, which ordinarily are comprised of two persons selected from the professional staffs of different components of the Department of Justice. A Panel first reviews a detainee's file, which includes (1) INS documents relating to the exclusion process; (2) incident reports received by the detainee while in detention, and, where applicable, any information concerning arrests, prosecutions, and convictions for offenses committed in the United States; (3) progress reports prepared by the BOP's institutional staff and the BOP's recommendation on continued detention or release; (4) a psychiatric/psychological report on the detainee prepared by the Public Health Service ("PHS"), if such a report has been requested or previously furnished; (5) any previous decisions concerning parole; and (6) any other information deemed relevant to the Panel's review.

If a Panel recommends a detainee's release based solely upon this record review, then the recommendation is promptly forwarded to the INS Commissioner's designated representative, who has been delegated the ultimate responsibility for deciding whether a detainee will be released on parole or continued in detention. If the Commissioner's representative approves the Panel's recommendation, then the detainee will be paroled as soon as a suitable sponsorship can be arranged. If, however, the Panel's recommendation is not approved, or if the Panel initially is unable to recommend release based upon its review of the detainee's file, then the Panel conducts a personal interview with the detainee.

Detainees are notified shortly after their arrival at a BOP facility of the purpose and procedures of the Review Plan, and when a Panel interview is to be conducted, the detainee is given written notice of the time and place of his interview at least seven days in advance. The detainee has the right to be accompanied at the interview by a person of his choice, who may assist him in presenting his case or answering the Panel's inquiries. The detainee and the person assisting him, if any, are given access to INS documents relating to the exclusion process; BOP incident reports, progress reports and release recommendation; information concerning arrests, prosecutions, and convictions for offenses committed in the United States; and the Commissioner's previous decisions, if any, concerning parole. The detainee may submit to the Panel any information, either orally or in writing, which he believes demonstrates that it is in the public interest that he be released.

The burden of proof is on the detainee to convince the Review Panel that (1) he is presently a non-violent person, (2) he is likely to remain non-violent, and (3) he is unlikely to commit any criminal offense following his release. In making its recommendation the Panel considers such factors as (1) the nature and number of disciplinary infractions or incident reports received while in custody; (2) the detainee's history of criminal behavior; (3) psychiatric and psychological reports pertaining to the detainee's mental health; (4) institutional progress relating to participation in work, educational and vocational programs; and (5) any other information which, in the Panel's judgment, is probative of whether the detainee is likely to adjust to life in a community, whether he is likely to engage

in future acts of violence, or whether he is likely to engage in future criminal activity. "Disturbing doubts are . . . to be resolved against the detainee. . . . [T]he ultimate concern under this Review Plan is the protection of American society from a dangerous detainee who is inadmissible under the immigration laws." Status Review Plan and Procedures, Part III (C)(2)(e) n. *.

Within ten days from the completion of the interview, the Panel forwards its recommendation to the Commissioner's representative with a summary of the interview as well as a file review summary. The representative reviews this material and may request that a copy of the detainee's file or specific information contained therein be forwarded or otherwise made available to him. He then reaches a final decision concerning release based on the same criteria as were applied by the Review Panel. If the decision is to release from custody, a further decision is made as to any conditions to be placed on the alien, such as parole to a special placement project supervised by the Community Relations Service of the Department of Justice ("CRS"). If the decision is for further detention, the Commissioner's representative must state the basis for his decision. A copy of the decision, together with another copy in Spanish, is then provided to the detainee.

Even after final approval for release, the Commissioner may withdraw the approval on the basis of the detainee's behavior while he is awaiting suitable sponsorship or placement. A withdrawal decision is based on information supplied by BOP staff or the Review Panel and does not involve any further interview with the detainee or other opportunity to explain his behavior.

Within one year after a final determination by the Commissioner not to release a detainee or to withdraw a prior approval for release, a further review is conducted applying the same criteria and procedures as the initial review. Annual status reviews continue so long as the alien remains in detention.

### B. *The* Mathews *Factors*

"It is axiomatic that due process 'is flexible and calls for such procedural protections as the particular situation demands.' " *Greenholtz, supra,* 442 U.S. at 12, 99 S.Ct. at 2106 (*quoting Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972)). In *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976), the Supreme Court identified three factors to be considered in determining the dictates of due process in a particular situation:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

The government commends to this Court the Supreme Court's application of the *Mathews* factors in *Greenholtz, supra,* 442 U.S. at 13–16, 99 S.Ct. at 2106–08, where the Court held that Nebraska's parole determination procedures fulfilled constitutional requirements. The Nebraska procedures at issue in *Greenholtz* permitted denial of parole following an initial review hearing at which the Parole Board examined the inmate's record, then interviewed the inmate and considered any letters or statements that he wished to present in support of his claim for release. It is true that these procedures are quite similar to those employed under the Attorney General's Status Review Plan. Once again, however, the Court must note that the inmates in *Greenholtz,* unlike petitioners here, were seeking early release from fixed terms of imprisonment imposed as a result of criminal convictions. Contrary to the government's contention that "this distinction is of little importance," Defendants' Memorandum in Opposition to Habeas Corpus Petition at 72,

the *Greenholtz* Court recognized that prior criminal convictions, with their attendant due process protections, significantly affected the scope of the process due in a subsequent parole release proceeding. "Merely because a statutory expectation exists cannot mean that *in addition to the full panoply of due process required to convict and confine* there must also be repeated, adversary hearings in order to continue the confinement." *Greenholtz, supra,* 442 U.S. at 14, 99 S.Ct. at 2107 (emphasis added). By implication, however, where, as in the instant case, the original confinement is based on an excludability determination subject, at best, only to limited procedural protections, then more elaborate procedures may be required in order to continue confinement after a protected liberty interest has arisen.

This distinction is most easily understood in terms of the second *Mathews* factor, the risk of erroneous deprivation of the protected interest. The informal procedures approved in *Greenholtz* carry little risk of error since in that context the reliability of the principal facts underlying the parole decision has already been sufficiently guaranteed by the procedural protections governing the prior criminal proceedings. In contrast, the risk of error is substantially greater in the instant case, because the Review Panels may rely on unsubstantiated or untested information, such as evidence introduced at a detainee's exclusion hearing of crimes committed in Cuba, incident reports placed in a detainee's file by BOP staff, and allegations of criminal misconduct in the United States.

While, as already noted, the exclusion hearing does accord the detainee some procedural rights, it does not approach the rigorous procedural protections afforded a defendant in a criminal trial. Moreover, the focus of the exclusion hearing is not an alien's potential dangerousness, which is the concern of the Review Panel, but whether he is excludable under one or more of the provisions of 8 U.S.C. § 1182(a). As to

information concerning an alien's behavior while in detention, informal prison disciplinary procedures simply do not provide sufficient guarantees of trustworthiness to allow such information to serve even as a partial basis for indefinite, and possibly permanent, incarceration. Finally, aliens charged with criminal conduct in this country but never brought to trial by state or local authorities have never had any opportunity to rebut the allegations of wrongdoing that may supply the basis for a Review Panel's decision to continue detention.

■ Accordingly, while procedures such as those provided under the Attorney General's Status Review Plan may be constitutionally sufficient in the context of parole release determinations for convicted criminals, the Court concludes that they are not adequate in the context of parole decisions regarding excludable aliens whose detention has continued beyond a reasonable period of time for effecting their exclusion. On the other hand, the Court rejects petitioners' suggestion that the process that is due them is nothing short of a full blown criminal trial.

■ While it is certain that "a detainee may not be *punished* prior to an adjudication of guilt in accordance with due process of law," *Bell v. Wolfish,* 441 U.S. 520, 535, 99 S.Ct. 1861, 1872, 60 L.Ed.2d 447 (1979) (emphasis added); the Court is mindful of the "distinction between punitive measures that may not constitutionally be imposed prior to a determination of guilt and regulatory restraints that may be." *Id.* at 537, 99 S.Ct. at 1873. In *Kennedy v. Mendoza-Martinez,* 372 U.S. 144, 168–69, 83 S.Ct. 554, 567–68, 9 L.Ed.2d 644 (1963), the Court described the tests traditionally applied to determine whether a governmental act is punitive in nature:

Whether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as a punishment, whether it comes into play only on a finding of *scienter,* whether its oper-

ation will promote the traditional aims of punishment—retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned are all relevant to the inquiry, and may often point in differing directions [footnotes omitted].

With these factors guiding its analysis, the Court "must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." *Bell v. Wolfish, supra,* 441 U.S. at 538, 99 S.Ct. at 1873. Where, as here, the government has expressed no intent to punish, "that determination generally will turn on 'whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it].'" *Id. (quoting Kennedy, supra).*

■ In the instant case, the government argues, the purpose of petitioners' detention is not punishment for past acts but protection of the public from potential future acts of crime or violence. Under the present circumstances this is a legitimate governmental objective. Although such "preventive detention" has grave due process implications when applied to American citizens, *see, e.g., United States ex rel. Martin v. Strasburg,* 689 F.2d 365 (2d Cir.), *prob. juris. noted sub nom. Schall v. Martin,* —— U.S. ——, 103 S.Ct. 1765, 76 L.Ed.2d 340 (1983), it appears settled that aliens may be detained for the purpose of preventing potential future harm to the state. *Carlson v. Landon,* 342 U.S. 524, 542, 72 S.Ct. 525, 535, 96 L.Ed. 547 (1952); *see also Mezei, supra,* 345 U.S. at 223, 73 S.Ct. at 634 (Jackson, J., dissenting) ("Nor do I doubt that due process of law will tolerate some impounding of an alien where it is deemed essential to the safety of the state"). Even

though, after an initial period of time, detention gives rise to a liberty interest protected by the fifth amendment, the arising of this protected interest does not *extinguish* the government's authority to detain but simply subjects the exercise of that authority to new procedural safeguards.

■ Prevention of future criminal behavior is therefore a legitimate, alternative purpose to which petitioners' incarceration may rationally be connected. Moreover, petitioners' indefinite detention in a maximum security prison is not necessarily excessive in relation to this alternative purpose. Detainees deemed likely to commit future crimes or acts of violence may reasonably be thought to require a highly secure environment, and no maximum term of detention can reasonably be imposed where the government's purpose is prevention of crime rather than punishment. Still, under the procedures which the Court determines below are constitutionally required before indefinite detention is permissible, only the most clearly dangerous detainees will be subject to continued detention. Furthermore, the Court expects that even many of those determined nonreleasable following their initial detention hearing will, following further review at a not much later date, be approved for release.

If, then, petitioners are not entitled to full trial rights, but the Attorney General's Status Review Plan also fails to comport with due process requirements, it remains for the Court, guided in its analysis by the factors set out in *Mathews, supra,* to determine the requisite procedural safeguards to which petitioners are entitled before they may constitutionally be deprived of their liberty.

■ First of all, the private interest impaired by petitioners' detention is their personal liberty, which is obviously of fundamental importance. The opposing governmental interest is the protection of the public from possible criminal acts. Apart from this admittedly legitimate interest, how-

ever, the government also has an interest in *not* detaining any Cuban based on erroneous information or an erroneous evaluation of the alien's potential dangerousness. *Cf. Morrissey, supra,* 408 U.S. at 484, 92 S.Ct. at 2601. Society has at least an economic interest in avoiding the high costs of incarcerating aliens who pose no realistic threat of criminal behavior and who might otherwise play a productive role in the economy. Furthermore, our society has a fundamental interest in treating all persons with basic fairness, because to do otherwise is contrary to the most cherished principles on which this nation was founded—"that all men are created equal, that they are endowed by their Creator with certain inalienable rights, [and] that among these are Life, Liberty and the pursuit of Happiness." *The Declaration of Independence* (1776). When these principles are ignored, those subjected to arbitrary treatment are not the only ones to suffer; we as a nation also are injured by the debasement of the fundamental values that protect our own freedom.

 Given the primary importance of the interests at stake on both sides of this controversy, and the concomitant need to avoid erroneous decisions, the Court's analysis of the dictates of due process accords little weight to "the fiscal and administrative burdens that . . . additional or substitute procedural requirement[s] would entail." *Mathews, supra,* 424 U.S. at 335, 96 S.Ct. at 903. Rather, having already determined that the procedures now in use carry with them a significant risk of erroneous deprivation of petitioners' liberty, the Court's principal focus is on "the probable value, if any, of additional or substitute procedural safeguards." *Id.* If such procedures will significantly enhance the reliability of the decision making process, then they are not to be rejected even if they entail substantial additional fiscal and administrative costs.[6]

### C. *The* Morrissey *Procedures*

Petitioners submit that as an initial minimum, they are entitled to the same procedures mandated by the Supreme Court in *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), for revocation of parole. In that context the Court held that the minimum requirements of due process included:

(a) written notice of the claimed violations of parole; (b) disclosure to the parolee of evidence against him; (c) opportunity to be heard in person and to present witnesses and documentary evidence; (d) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation); (e) a "neutral and detached" hearing body such as a traditional parole board, members of which need not be judicial officers or lawyers; and (f) a written statement by the factfinders as to the evidence relied on and reasons for revoking parole.

*Id.,* 408 U.S. at 489, 92 S.Ct. at 2604. For the reasons set out below, the Court agrees with petitioners that each of the foregoing procedures is an essential part of a constitutionally adequate detention hearing.

 1. *Written Notice and Disclosure of Evidence.* Where proposed government action (in the instant case, continued detention) is challenged "as resting on incorrect or misleading factual premises or on misapplication of rules or policies to the facts of particular cases," petitioners are entitled to "timely and adequate notice detailing the reasons for [the] proposed [action]." *Goldberg v. Kelly,* 397 U.S. 254, 267–68, 90 S.Ct. 1011, 1020, 25 L.Ed.2d 287 (1970). The government, however, contends that because "the decision involved here is essentially predictive, rather than factual," the hearing should not be limited to "prespecified factual allegations." Defendants' Memorandum in Opposition to Habeas Corpus Petition at 73.

---

**6.** In any event the cost of providing petitioners with proper hearings is bound to be substan- tially less than the exorbitant cost of continued improper incarceration.

The Court fully understands that a decision to detain is based on a prediction of potential dangerousness; however, the Court is at a loss as to how this prediction is to be divorced from specific factual findings. The difficulties of predicting human behavior are well known, and to the extent that such predictions are not firmly grounded on adequate factual premises, their reliability is all the more suspect. The Court recognizes that because of the predictive nature of the decision involved, not all relevant evidence will be of a strictly factual character. The detention hearing will therefore not be limited merely to "prespecified factual allegations." There is certainly room, for example, for expert testimony as to a detainee's propensity for violence. Still, in order to safeguard the factfinding process that necessarily precedes any reasoned prediction of dangerousness, petitioners are entitled to prior written notice, in Spanish, of all factual allegations that the government contends support a decision to continue detention, together with a brief statement of the substance of any expert testimony that the government intends to introduce at the detention hearing.

While there is some dispute as to precisely what information in government files is presently made available to detainees under the Status Review Plan, there is no need for the Court to resolve that dispute. Henceforth detainees must be provided *all* information on which the government intends to rely to support a detention decision. Moreover, in order to provide detainees sufficient time to prepare their case for hearing, this information, together with the written notice of factual allegations and summary of expert testimony, should be made available to the detainee at least fifteen (15) days prior to the hearing date.

By thus defining the factual basis for the government's prediction of dangerousness and giving the detainee an opportunity to correct any errors in the government's facts, the reliability of the decisionmaker's ultimate determination is clearly enhanced. Contrary to the government's contention, this is not an "arbitrary limitation" on the evidence that may be considered but merely a procedural safeguard to ensure that whatever evidence is considered is subjected to a fair opportunity for rebuttal from the other side.

■ *2. Presentation of Evidence.* The current Panel Review process permits a detainee to be heard in person and to bring information to the attention of the Panel. If, however, a detainee is to have a meaningful opportunity to develop information militating against an inference that he is potentially dangerous, then he must be allowed to present witnesses and documentary evidence to support his own version of facts relied on by the government, as well as to show other circumstances that indicate further detention is unnecessary. Accordingly, detainees must have the right to compel the attendance of witnesses and to present documentary evidence at their hearings, except where overriding needs of prison discipline prohibit such presentation of evidence. *See Wolff v. McDonnell,* 418 U.S. 539, 566–67, 94 S.Ct. 2963, 2979–80, 41 L.Ed.2d 935 (1974). Where the individual conducting a hearing refuses to call a witness or limits access to other inmates needed to collect statements or compile other documentary evidence, he should state the reason for such refusal or limitation, "whether it be for irrelevance, lack of necessity, or the hazards presented in individual cases." *Id.*

The government opposes this due process requirement with a citation to *Greenholtz, supra,* where the Court distinguished parole *release* from parole *revocation,* and held that in the former case due process did not require a formal hearing, with its attendant right to call witnesses and produce evidence. *Id.,* 442 U.S. at 13–14, 99 S.Ct. at 2106–07. As the Court has already held, however, petitioners here, although presently incarcerated, are entitled to their freedom absent a sufficient showing that, if

released, they would be likely to abscond, to pose a risk to the national security, or to pose a significant threat of harm to persons or property in the United States. The inmates in *Greenholtz,* on the other hand, while possessing a statutorily created expectancy of parole, were also under sentence for specific criminal offenses. It is true that, despite this difference, the parolé decision in the instant case, like that in *Greenholtz,* is in large part both subjective and predictive in nature. However, the decisionmaker in *Greenholtz,* like any typical parole board, possessed an intrinsically reliable core of facts on which he could focus in making the more subjective parole decision, *i.e.,* the offense for which the inmate seeking parole originally had been convicted and sentenced. With regard to the Cuban detainees, no such reliable core of facts exists. It is all the more important, therefore, that a reliable factual predicate be developed at a hearing to support the concededly subjective prediction on which a parole decision is based. Accordingly, detainees must be accorded the right to call witnesses and present documentary evidence on their own behalf.

 3. *Confrontation and cross-examination.* The same need for reliable factual determinations that supports petitioners' right to present evidence also mandates that they be allowed to confront and cross-examine witnesses who provide evidence in support of continued detention. *See Goldberg v. Kelly,* 397 U.S. 254, 269, 90 S.Ct. 1011, 1021, 25 L.Ed.2d 287 (1970). This right, like the right to present evidence, may be overriden only where "the hearing officer specifically finds good cause for not allowing confrontation." *Morrissey, supra,* 408 U.S. at 489, 92 S.Ct. at 2604; *cf. Wolff, supra,* 418 U.S. at 567–68, 94 S.Ct. at 2980–81 (confrontation and cross-examination not constitutionally required in prison disciplinary hearings because of potential disruptive effects).

 4. *Neutral Hearing Body.* The Court agrees that petitioners are entitled to an impartial decisionmaker; however, this does not imply that personnel of the Department of Justice are disqualified from acting in this capacity. The Court is mindful that the parole authority has been statutorily entrusted to the Attorney General, and it is doubtful, to say the least, whether the Court has the power, even under these unusual circumstances, to require that that authority be exercised by some other official. Accordingly, the Attorney General may designate the individuals who shall conduct the hearings required under this order. However, these hearing officers must abide by certain standards designed to ensure their impartiality. Their conclusion as to a detainee's releasability "must rest solely on the legal rules and evidence adduced at the hearing." *Goldberg, supra,* 397 U.S. at 271, 90 S.Ct. at 1022. Therefore, contrary to the prior practice of Panel members, these hearing officers shall not be given access to a detainee's file, or any other information regarding the detainee, outside the context of the hearing itself. This standard means, *inter alia,* that no current Panel member may act as a hearing officer in the case of a detainee whom he has previously reviewed as part of the Attorney General's Status Review Plan. Furthermore, the hearing officer who conducts the hearing must make the final decision as to whether parole will be granted.

 5. *Written Statement of Reasons.* Partly to demonstrate compliance with the foregoing requirement that only evidence adduced at the hearing be considered, "the decisionmaker should state the reasons for his determination and indicate the evidence relied on, ... though his statement need not amount to a full opinion or even formal findings of fact and conclusions of law." *Goldberg, supra,* 397 U.S. at 271, 90 S.Ct. at 1022. This record of the basis of the decision will also facilitate subsequent review of the hearing officer's determination if a detainee should seek habeas relief following an adverse decision.

D. *Further Procedural Claims*

In addition to the foregoing procedures outlined in the *Morrissey* case, petitioners

contend that they also are entitled to certain additional procedural protections, including (1) the privilege against self-incrimination guaranteed by the fifth amendment; (2) the right of indigent detainees to counsel at government expense; and (3) the placing of the burden of proof on the government.

■ 1. *Privilege Against Self-Incrimination.* The government does not dispute that petitioners are entitled to the protection of the fifth amendment's privilege against self-incrimination. Instead, the government argues that the privilege is not violated when an adverse inference is drawn from a detainee's refusal to answer questions. The government first cites *United States ex rel. Bilokumsky v. Tod,* 263 U.S. 149, 44 S.Ct. 54, 68 L.Ed. 221 (1923), where the Court held that a defendant in a deportation proceeding could be compelled to testify as to his alienage, or the inference that he was an alien could be drawn from his silence. However, in *Tod* the Court specifically noted that since alienage was not an element of a crime, "testifying concerning his status could not have had a tendency to incriminate him." *Id.,* 263 U.S. at 154, 44 S.Ct. at 56. It is certainly true that a detainee is not privileged to refuse to testify as to matters that could not reasonably incriminate him in future criminal proceedings. The privilege simply "protects any disclosures which the witness may reasonably apprehend could be used in a criminal prosecution or which could lead to other evidence that might be so used." *Murphy v. Waterfront Commission,* 378 U.S. 52, 94, 84 S.Ct. 1594, 1611, 12 L.Ed.2d 678 (1964). Thus, for example, testimony concerning a detainee's criminal behavior in Cuba would not be privileged, since such acts could not form the basis for any criminal prosecution in the United States.

The government also cites *Baxter v. Palmigiano,* 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976), where the Court held that the privilege did not prevent prison officials from drawing an adverse inference

from an inmate's failure to testify in a prison disciplinary proceeding. The Court noted that this "conclusion is consistent with the prevailing rule that the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them." *Id.,* 425 U.S. at 318, 96 S.Ct. at 1558. The rule against drawing an adverse inference is therefore applicable only to defendants "[i]n criminal cases, where the stakes are higher and the State's sole interest is to convict."

■ In the instant case, however, although petitioners are not subject to criminal prosecutions, the stakes are certainly as high as, or even higher than, in the typical criminal case. An adverse finding at a detention hearing, like a criminal conviction, results in incarceration; but unlike persons convicted of criminal offenses, a Cuban detainee's imprisonment is indefinite and, given the success of past efforts to return detainees to Cuba, very likely to be long-term. Thus, if the government's position were accepted, a truly anomalous situation would be created. If a Cuban detainee were actually charged with committing a criminal offense in the United States, he would be entitled to have no adverse inference drawn from his refusal to testify at trial, and his sentence upon a subsequent conviction would be limited to some maximum term of imprisonment. If, however, no criminal proceedings were ever instituted against him, evidence of the crime could nevertheless be introduced at his detention hearing, and his silence could then be treated as an admission of guilt supporting a decision to imprison him indefinitely.

Accordingly, because of the extreme consequences that follow an adverse determination at a detention hearing, the Court concludes that, like criminal defendants, petitioners are entitled to the protection of the "no adverse inference" rule. Hearing officers, therefore, may not draw an inference from a detainee's failure to testify

about facts relevant to crimes allegedly committed in the United States. It should be made clear, however, that this does not mean that a detainee is protected from any adverse inferences whatsoever being drawn as a result of his refusal to take the stand at all. Unlike a criminal trial, a detention hearing is not concerned only with matters relating to the individual's guilt of a criminal offense. Other matters not related to possible criminal liability, and thus not within the scope of the privilege, may be inquired into, and a detainee's refusal to testify as to such matters may validly support an adverse inference. Thus, for example, an adverse inference may be drawn from a detainee's refusal to answer questions concerning alleged criminal activity in Cuba.

■ 2. *Right to Counsel.* In *Gagnon v. Scarpelli,* 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973), the Supreme Court extended Morrissey, *supra* to require due process hearings for probation, as well as parole, revocations, but the Court declined to hold that an indigent probationer or parolee has a due process right to be represented by appointed counsel at these hearings. In *Gagnon,* however, the Court emphasized that it was dealing "not with the right of an accused to counsel in a criminal prosecution, but with the more limited due process right of one who is a probationer or parolee only because he has been convicted of a crime [footnote omitted]." *Id.,* 411 U.S. at 789, 93 S.Ct. at 1763. In this context, "the decision as to the need for counsel must be made on a case-by-case basis ... [although] there will remain certain cases in which fundamental fairness—the touchstone of due process—will require that the State provide at its expense counsel for indigent probationers or parolees." *Id.,* 411 U.S. at 790, 93 S.Ct. at 1763.

Petitioners, however, unlike the probationers and parolees in *Morrissey* and *Gagnon,* have never been convicted and sentenced following a trial at which they were entitled to appointed counsel. Their situation is more akin to that of the probationer in *Mempa v. Rhay,* 389 U.S. 128, 88 S.Ct. 254, 19 L.Ed.2d 336 (1967), who the Court held to be entitled to representation by appointed counsel at a combined revocation and sentencing hearing. Reasoning that counsel is required "at every stage of a criminal proceeding where substantial rights of a criminal accused may be affected," *id.,* 389 U.S. at 134, 88 S.Ct. at 257, and that sentencing is one such stage, the Court concluded that counsel must be provided an indigent at sentencing even when it is accomplished as part of a subsequent probation revocation proceeding. Although petitioners' detention hearings are not criminal proceedings, the detainees' "substantial right" to liberty is at stake in these hearings. If Mempa, who had already pled guilty to a criminal charge and been placed on probation, was nevertheless entitled to appointed counsel in a subsequent sentencing proceeding, then, *a fortiori,* petitioners in the instant case are entitled to appointed counsel at the hearing that will determine whether they are to be committed to an indefinite term of imprisonment.

The same conclusion may be reached by alternative means, applying the case-by-case analysis prescribed in *Gagnon, supra.* There the Court recognized that due process would require the appointment of counsel for probationers and parolees who lacked the skill or education to present their own cases adequately. *Id.,* 411 U.S. at 787, 93 S.Ct. at 1762. Specifically, the decision on whether to appoint counsel should take into account "whether the probationer appears to be capable of speaking effectively for himself." *Id.,* 411 U.S. at 791, 93 S.Ct. at 1764. In the instant case, petitioners as a class clearly lack the requisite ability to represent their own interests competently. None is fluent in English, and many are illiterate even in their native Spanish. Also, the American legal system is foreign to them all. Therefore, because petitioners are unlikely to be able to understand or adequately protect their own rights, they are entitled to appointed counsel to rep-

resent them in detention hearings.[7] *Cf. Vitek v. Jones,* 445 U.S. 480, 496–97, 100 S.Ct. 1254, 1265–66, 63 L.Ed.2d 552 (1980) (indigent prisoners whom the state seeks to treat as mentally ill entitled to counsel) (plurality opinion).

### 3. *Burden of Proof.*

■ In keeping with the government's view that excludability alone is a sufficient predicate for indefinite detention, and that parole of excludable aliens is a matter of "grace," the Attorney General's Status Review Plan places the burden on the detainee to convince the Panel that he is not dangerous and should therefore be released. The Court, however, has rejected the government's view of its detention authority, and this entails as well a shifting of the burden of proof onto the government.

The Court has held that once an excludable alien's detention can no longer be justified as an aid to effecting the alien's exclusion, then the alien acquires a constitutionally protected interest in being free. That is to say, a legitimate expectation arises that the detention will end *unless some new justification for continuing the detention is established.* The logic of this holding dictates that the alien detainee is entitled to a presumption of releasability which roughly corresponds to the presumption of innocence routinely accorded a criminal defendant. While in a criminal prosecution the government carries the burden of proving that the accused committed each element of the charged offense, in the case of excludable aliens detained beyond a reasonable period of time to effect their exclusion, the government, in order to continue detention, must establish that the detainee is likely, if released, to abscond, to pose a risk to the national security or to pose a significant and serious threat to persons or property in the United States. Absent such proof, the detainee is entitled to his freedom.

Although petitioners are thus entitled to a presumption of releasability analogous to the presumption of innocence enjoyed by criminal defendants, the Court does not believe it would be appropriate also to require the government to meet the strict criminal standard of proof beyond a reasonable doubt. First of all, although an adverse determination in a detention hearing does result in a detainee's continued incarceration, it does not carry with it the same stigma as does conviction of a specific criminal offense. The protection afforded by a strict standard of proof is therefore somewhat less important in the context of a detention hearing than it is in a true criminal proceeding. Second, and more important, is the nature of the inquiry that takes place in a detention hearing as compared to that in a criminal trial. As has already been noted, the ultimate purpose of a detention hearing is to arrive at a reasonably reliable prediction of a detainee's danger-

---

**7.** Contrary to the government's argument, appointment of counsel for detainees is not inconsistent with 8 U.S.C. § 1362, which provides:

In any exclusion or deportation proceedings before a special inquiry officer and in any appeal proceedings before the Attorney General from any such exclusion or deportation proceedings, the person concerned shall have the privilege of being represented (at no expense to the Government) by such counsel, authorized to practice in such proceedings, as he shall choose.

This section does not encompass such hearings as are mandated by the instant order nor imply that appointment of counsel in such hearings is prohibited. The Court agrees with petitioners that 18 U.S.C. § 3006A provides the appropriate procedural vehicle for appointment of coun-

sel to represent petitioners at their individual detention hearings. That section requires each district court to implement

a plan for furnishing representation for any person financially unable to obtain adequate representation . . . (3) who is subject to revocation of parole, in custody as a material witness, or seeking collateral relief, as provided in subsection (g), or, (4) for whom the Sixth Amendment to the Constitution requires the appointment of counsel or for whom, in a case in which he faces loss of liberty, any Federal law requires the appointment of counsel.

18 U.S.C. § 3006A(a). Petitioners are within the ambit of both paragraphs (3) and (4) and therefore may have counsel appointed for them pursuant to this section.

ousness. Given the vagaries of human behavior, such a prediction is almost necessarily subject to some question and thus can rarely be made "beyond a reasonable doubt." The application of this strict criminal standard to detention hearings would, therefore, unduly infringe on the government's legitimate interest in detaining persons who are potentially dangerous.

While the reasonable doubt standard is thus too strict, the general civil standard of proof by a preponderance of the evidence is not sufficiently rigorous where, as here, a person's liberty is at stake. The Court therefore holds that the appropriate standard to be applied in petitioners' detention hearings is proof by clear and convincing evidence. In order to continue petitioners' detention, the government will be required to come forward with clear and convincing evidence that a detainee, if released, will be likely to abscond, to pose a risk to the national security, or to pose a significant and serious threat to persons or property in the United States.[8] In the Court's view, this standard of proof strikes the appropriate balance between petitioners' interest in their liberty and the government's interest in safeguarding the American public.

### E. Parole Revocation

 As the Court noted at the outset, many members of the petitioning class have been incarcerated following revocation of parole previously granted by the government. Many of these individuals were paroled into the country upon their initial arrival on these shores; others were detained for a period of time and then released, some as a result of review under the Attorney General's Status Review Plan. Petitioners incarcerated as a result of parole revocations contend that the revocation of their paroles did not comport with due process requirements. They also argue that with respect to certain subclasses, the revocation of parole was an abuse of the Attorney General's discretion.

The government insists that the issue of parole revocation is not properly before the Court, because that issue is not raised in any of the complaints in these consolidated cases and is not adequately addressed in the factual record. Petitioners, however, have from the beginning challenged the legality of their detention. Since petitioners' allegedly unlawful detention may result from procedurally inadequate revocations of parole, as well as from procedurally inadequate detention hearings, both of these proceedings are the proper concern of the Court in these cases. Moreover, the Court need not, and will not, make any factual determinations concerning specific government parole revocation practices. The Court will focus instead on the government's stated policy with respect to parole revocations and consider whether due process dictates any further procedural protections beyond those already afforded under this policy.

The current general parole revocation policy, as embodied in wire instructions to INS field offices dated May 17, 1982, is to revoke the parole of any Mariel Cuban (1) who has been convicted in the United States of a felony or a serious misdemeanor

---

8. Petitioners also argue that these standards for determining when an alien may be detained are impermissibly vague, and that the government should be required to adopt more specific standards in order to provide adequate direction to decisionmakers. The Court, however, does not believe that the specificity of standards that is required before criminal sanctions may be imposed, see *Grayned v. Rockford,* 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972); *Papachristou v. Jacksonville,* 405 U.S. 156, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972), is also mandated under the present circumstances. Because the parole decision embodies a prediction of future behavior, the standards governing that decision simply are not amenable to the kind of precise definition that is required in the criminal context. To demand more specific standards would thus thwart the government's legitimate interest in detaining potentially dangerous aliens. Although the necessarily imprecise standards governing the parole decision do allow the decisionmaker a wide discretion, any abuse of that discretion may be corrected in a subsequent individual habeas corpus proceeding.

and who has completed the imprisonment portion of the sentence given for the conviction; or (2) who presents a clear and imminent danger to the community or himself. The guidelines for implementing this policy are set forth in the declaration of John A. Simon, the INS official responsible for coordinating the revocation of parole of Mariel Cubans and arranging for their placement in federal detention facilities:

> Although the INS District Director has the authority to revoke parole, such authority is not exercised until the case has been discussed with the INS Central Office to determine if the alien, who meets the criteria for parole revocation, has any equities which would not warrant detention by the INS. In revocations following criminal convictions, the Bureau of Prisons (BOP) is contacted and given the facts. The BOP notifies INS of its concurrence and of which [sic] BOP facility to send the alien (i.e., Atlanta, Lexington, Springfield).

> In non-criminal conviction cases, the INS District Director is usually contacted by a sponsor who no longer wishes to sponsor the alien. The sponsor is required to provide the District Director with documentation showing why he can no longer sponsor the alien. The District Director will then contact the Central Office with the facts in the case. The CRS [Community Relations Service of the Department of Justice], is contacted by the Central Office as to the possibility of arranging another sponsorship. The District Director is authorized to revoke the parole only when the alien is deemed to be a clear and imminent danger to the community or to himself. The alien whose parole is revoked is then sent to an appropriate Federal detention facility.

Declaration of John A. Simon, Attachment to Defendants' Response to Plaintiffs' Post Oral Argument Memorandum, ¶¶ 8 and 9. In addition to this general policy the government has recently adopted a supplemental policy that applies only to Mariel Cubans settled in special placement halfway house programs. A Mariel Cuban paroled to such a special placement project may have his parole revoked either pursuant to the general policy set forth above or if he violates one of the special parole conditions applicable to those settled at such projects. The INS has set out these special parole conditions in its memorandum of March 1, 1983, see Exhibit D to Declaration of John A. Simon, and since approximately February 15, 1983, each special placement parolee has been required to sign a statement indicating that he understands the special conditions of his parole and that the parole is subject to revocation if he violates any of those conditions. INS has also requested special project directors to inform previously paroled Cubans of the new parole conditions.

According to the government, the supplemental policy concerning parole revocation for special placement parolees was adopted to encourage acceptance of "borderline" detainees by project directors, to better protect project staff and the surrounding community, and to impress on the parolee the need to adopt appropriate behaviour patterns if his integration into American society is to be successful. The parole conditions imposed on special placement parolees include (1) geographical limits on freedom of movement, (2) prohibition on possession or use of drugs or weapons, (3) compliance with program rules, such as curfew and work assignments, and (4) participation in special programs prescribed for drug or alcohol abuse and medical or psychiatric treatment. By imposition of such parole conditions, the government puts the special placement parolee on notice that his parole may be revoked once his behavior becomes seriously disruptive, even though he may not have committed any serious crime.

The Court believes that the government's parole revocation policies are reasonable under the difficult circumstances presented by the Cuban entrants. It is not per se an abuse of discretion to revoke parole on the

basis of behavior that is not criminal, or to revoke parole on the basis of criminal behavior even after the parolee has served his full sentence following conviction. As the Court has already held, the government's purpose in detaining excludable aliens, either initially or following revocation of parole, is not to punish the alien for his past behavior but to protect the public from possible criminal behavior in the future. Thus, it is not inherently unreasonable to return an alien to detention even though he has not committed any serious crime, or when he has completed his sentence for any crime that was committed. A well-founded prediction of dangerousness, which would justify a return to detention, may be made even in the absence of actual criminal behavior or after the completion of a specific term of imprisonment.

 On the other hand, paroled aliens have at least as much of an interest in their continued liberty as presently detained aliens do in gaining their freedom. While the Court does not consider whether parole might be revoked without a hearing in order to effect an alien's immediate exclusion, it is nonetheless clear from the Court's prior rulings that an alien whose parole is revoked in order to return him to indefinite detention in this country has a liberty interest that is entitled to due process protection. In determining what procedures are required in the parole revocation context, the Court relies again on *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972).

In *Morrissey, supra,* 408 U.S. at 485, 92 S.Ct. at 2602, the Court distinguished "two important stages in the typical process of parole revocation." The first stage occurs when the parolee is initially arrested on the basis of an alleged parole violation, often at a place distant from the paroling institution to which he may be returned. At this point, the Court held,

> due process would seem to require that some minimal inquiry be conducted at or reasonably near the place of the alleged violation or arrest and as promptly as convenient after arrest while information is fresh and sources are available. Such an inquiry should be seen as in the nature of a "preliminary hearing" to determine whether there is probable cause or reasonable ground to believe that the arrested parolee has committed acts that would constitute a violation of parole conditions. [Citations omitted.]

*Id.* The Court then went on to describe the nature of this preliminary hearing. First, the probable cause determination must be made by "someone not directly involved in the case." *Id.* This decisionmaker "need not be a judicial officer"; the decision may be made instead "by someone such as a parole officer other than the one who has made the report of parole violations or has recommended revocation, [although a] State could certainly choose some other independent decisionmaker to perform this preliminary function." *Id.* at 486, 92 S.Ct. at 2603. Second, the parolee is entitled to notice of the time, place and nature of the hearing, including a statement of alleged parole violations. Third, "[a]t the hearing the parolee may appear and speak in his own behalf; he may bring letters, documents, or individuals who can give relevant information to the hearing officer." *Id.* at 487, 92 S.Ct. at 2603. Fourth, the parolee is also entitled to confront and cross-examine adverse witnesses, unless the hearing officer determines that an informant would be subjected to risk of harm if his identity were disclosed. Finally, the hearing officer must make a written summary of the evidence adduced at the hearing and, based on the information before him, determine whether there is probable cause to hold the parolee for a final revocation decision, state the reasons for his determination, and indicate the evidence relied on. A determination of probable cause would then warrant the parolee's continued detention and return to the paroling institution pending a final decision.

The nature of a Cuban parolee's interest in his continued liberty is comparable to

that of the parolees from state criminal sentences with whom the Court was concerned in *Morrissey.* The Court's description of the liberty interest at stake in *Morrissey* is therefore an equally apt characterization of the Cuban parolee's interest:

> The liberty of a parolee enables him to do a wide range of things open to persons who have never been convicted of any crime. The parolee has been released from prison based on an evaluation that he shows reasonable promise of being able to return to society and function as a responsible, self-reliant person. Subject to the conditions of his parole, he can be gainfully employed and is free to be with family and friends and to form the other enduring attachments of normal life. Though the State properly subjects him to many restrictions not applicable to other citizens, his condition is very different from that of confinement in a prison. He may have been on parole for a number of years and may be living a relatively normal life at the time he is faced with revocation. The parolee has relied on at least an implicit promise that parole will be revoked only if he fails to live up to the parole conditions. In many cases, the parolee faces lengthy incarceration if his parole is revoked.

*Id.,* 408 U.S. at 482, 92 S.Ct. at 2600–01. The nature of the state's interest in revoking the parole of parolees from criminal sentences is likewise comparable to the government's interest in revoking an excludable alien's parole. If anything, in the former case the state's interest in being able to return an individual to imprisonment without the burden of elaborate additional procedures is even greater than the government's interest in the instant case, since the parolee from a state criminal sentence has already been afforded the full panoply of due process required to convict and confine for a criminal offense. Even Cuban detainees who are subsequently paroled as a result of the detention hearing mandated by the Court in the instant order will not have enjoyed the full criminal trial rights that preceded Morrissey's conviction and ultimate parole.

■ Therefore, because the interests at stake here are so nearly identical to those that were at stake in *Morrissey* the Court concludes that Cuban parolees are entitled to the same procedural protections held to be due the parolees in that case. Accordingly, Cuban parolees are entitled to a *Morrissey*-type preliminary hearing before they may be returned to detention pending a final revocation hearing. Moreover, because a Cuban parolee is uniquely unqualified, due to his lack of knowledge of English and the ways of the American legal system, to represent himself at this preliminary hearing, he is entitled, in addition to the *Morrissey* procedures, to be represented by an appointed attorney.

At the preliminary hearing, the hearing officer must determine not only whether there is reasonable cause to believe that the conditions of parole have been violated but also, assuming there was a parole violation, whether there is reasonable cause to believe that detention is necessary in order to protect the integrity of the parole program or to safeguard the public from potential criminal behavior. If the hearing officer makes the requisite finding of probable cause, then the parolee may be returned to detention. Within a reasonable time thereafter, as contemplated by *Morrissey,* a final revocation hearing must be held. This hearing will be identical to the detention hearing to be provided to all Cubans already in detention, as set forth in Parts III C and D of the instant order. An adverse determination following this hearing will result in revocation of parole. A favorable determination, on the other hand, would mean that the detainee must be re-released as soon as a suitable sponsor can be found.

## V. *Abuse of Discretion*

■ Apart from their arguments regarding the government's detention authority and the requirements of due process, petitioners also contend that the Attorney

**1144**

General has abused his discretion and failed to follow his own criteria in making parole determinations for certain plaintiff subclasses. They seek a redefinition of the twelve subclasses originally certified by the Court in its order of August 7, 1981, *Fernandez-Roque v. Smith,* 91 F.R.D. 117, 124 (N.D.Ga.1981), and a determination that the Attorney General has abused his discretion in denying parole to members of each of the proposed new subclasses. The Court denies this final request of petitioners for the following reasons.

First, petitioners have failed to satisfy the prerequisites of Fed.R.Civ.P. 23(a) for class (or subclass) certification. They have proffered only a single member for each of the first nine proposed new subclasses and none for the tenth. *See* Exhibit 11 to Brief in Support of Habeas Corpus Petition. Moreover, there is no showing with respect to the proposed subclasses that denial of parole was based *solely* on the proposed new subclass criteria. Members of a single subclass might, therefore, differ individually as to the actual reasons for denial of parole.

█ Second, because detainees have been denied parole after individualized review under the Attorney General's Status Review Plan, the Court is convinced that any further review of that denial for abuse of discretion must be made on an individual basis. Since, under the terms of the instant order, all detainees are now entitled to a new detention hearing to determine whether they are entitled to parole, subsequent review for abuse of discretion in denial of parole may be obtained by a detainee's filing of an individual habeas corpus petition following an adverse determination in the detention hearing. In the context of that proceeding, the Court would review the Attorney General's decision not only to determine that there was compliance with the constitutional requirements set out in the instant order, but also to ascertain whether, based on the record produced at the detention hearing, the Attorney General's denial of parole amounted to an abuse of his discretion.

## VI. Conclusion

The Court has held above that the government has an implied statutory authority to detain excludable aliens indefinitely when their immediate exclusion is impracticable. However, after an initial period of time during which detention may reasonably be imposed as an aid to effecting an alien's exclusion, the Constitution requires that any further detention be justified on the basis of a procedurally adequate finding that the detainee, if released, is likely to abscond, to pose a risk to the national security, or to pose a significant threat to persons or property within the United States.

Because the Attorney General's Status Review Plan does not afford detainees procedurally adequate hearings, new detention hearings must be provided for each detainee embodying the following procedural guarantees.

First, the detainee is entitled to prior written notice of factual allegations allegedly supporting continued detention, as well as access to all information in government files on which the government intends to rely to support a detention decision. The scope of the hearing, however, is not limited to specific factual allegations but may, for example, include expert testimony as to a detainee's propensity for violence. The government must also provide the detainee with a brief summary of any such expert evidence prior to his detention hearing.

Second, detainees must have the right to compel the attendance of witnesses and to present documentary evidence at their hearings, except where overriding needs of prison discipline prohibit such presentation of evidence. The detainee will thus have a fair opportunity to establish his own version of disputed facts, as well as to show other circumstances that indicate further detention is unnecessary.

Third, the same need for reliable factual determinations that supports petitioners' right to present evidence also mandates that they be allowed to confront and cross-examine witnesses who provide evidence in support of continued detention. This right may also be overridden only for good cause related to the requirements of prison discipline.

Fourth, petitioners are entitled to a neutral decisionmaker to act as hearing officer at detention hearings. The hearing officer will be designated by the Attorney General, but his impartiality will be ensured by the requirements that he rest his decision solely on the evidence adduced at the hearing and that he provide a written statement of the reasons for his decision. Moreover, the hearing officer's decision as to whether parole should be granted will not be reviewable by any other government official. A detainee may, however, seek review of an adverse determination by petitioning this Court for individual habeas corpus relief.

Fifth, detainees are entitled to the protection of the fifth amendment's privilege against self-incrimination. However, a detention hearing, unlike a criminal trial, is not concerned only with matters relating to the individual's guilt of a specific criminal offense. Other matters not related to possible criminal liability, and thus not within the scope of the privilege, may be inquired into, and a detainee's refusal to testify as to such matters may validly support an adverse inference.

Sixth, petitioners have a right to be represented at their detention hearings by counsel provided at government expense. Only with the assistance of competent counsel familiar with both the English language and the American legal system can detainees hope to have a fair and meaningful hearing.

Seventh, petitioners are entitled to a presumption of releasability analogous to the presumption of innocence enjoyed by criminal defendants. Thus the government carries the burden of proving that continued detention of a detainee is necessary. To meet this burden the government must establish by clear and convincing evidence that a detainee, if released, will be likely to abscond, to pose a risk to the national security, or to pose a serious threat to persons or property in the United States.

Finally, when the government seeks to revoke the parole of a Mariel Cuban and place him in detention, then that person is entitled to a preliminary hearing near the site of the alleged parole violation in addition to a subsequent detention/parole revocation hearing.

Absent such hearings as set out above petitioners' continued detention is illegal. Accordingly, the government must provide petitioners with hearings as described in the instant order within a reasonable time, or else petitioners must be released.[9] In order to facilitate prompt compliance with the constitutional requirements described herein, the government is ORDERED to file with the Court within 30 days of the date of this order its plan for providing petitioners with the requisite detention hearings. Petitioners' shall have 15 days thereafter to file a response. The Court will then seek to resolve any differences between the parties and clarify any ambiguities in the instant order. Hearings should begin no later than 60 days from the date of this order.

## SUMMARY

In sum, the government is ORDERED to file within 30 days of the date of this order a plan for providing petitioners the hear-

---

**9.** The Court believes that detainees who are denied parole following the detention hearing required by the instant order will thereafter be entitled to some periodic review to determine if parole has subsequently become appropriate. However, because the parties have not addressed this issue, the Court will defer any ruling on what form this subsequent review must take. The government should submit its views on this question to the Court within 30 days of the date of this order. They may be incorporated in the plan submitted pursuant to the Court's order in the text *infra*. Petitioners shall have 15 days to respond.

ings to which they are constitutionally entitled before they may be legally detained. Petitioners shall have 15 days thereafter to reply, and hearings shall begin no later than 60 days from the date of this order.